21024. BUFFALO FORGE COMPANY *v.* SOUTHERN RAILWAY COMPANY *et al.*

DECIDED JUNE 15, 1931.

446

*Underwood, Haas & Gambrell, R. Emerson Gardner,* for plaintiff.
*McDaniel, Neely & Marshall, W. O. Wilson,* for defendants.

BELL, J. (After stating the foregoing facts.) A materialman who furnishes material to a subcontractor for the improvement of real estate is not entitled to a lien upon the property so improved, where the subcontractor has no contractual relation with the owner of the realty. *General Supply Co.* v. *Hunn,* 126 *Ga.* 615 (55 S. E. 957). The question for decision in this case is whether the Seeley company was a subcontractor. If so, the judgment of the superior court was correct, but if this company was a contractor, and not a mere subcontractor, the plaintiff was entitled to its lien and the court erred in sustaining the certiorari. The solution of this question will depend upon the nature of the contract between the railway company, as owner, and the engineers company, by which the contract was made with the Seeley company for the installation of the heating system. If the engineers company was itself the contractor, then the Seeley company was a subcontractor, but if the engineers company was made the agent of the railway company for the erection of the building, the Seeley company became the contractor, and the plaintiff's claim of lien should have been established.

The following is a statement of the material portions of the contract between the railway company and the engineers company:

"New York, March 14, 1928.

"Southern Railway System, Washington, D. C.

"We hereby propose to design and construct for you at Atlanta, Georgia, a two-story addition to office building and a five-story addition to freight warehouse, together with such other changes to lower floors of these buildings as may be necessary.

"I. *Service to be rendered.* With respect to this work we propose to act as your own engineering, construction and purchasing departments, being guided in all respects by such instructions as you may from time to time give us. As engineers, we will make all necessary engineering studies and determinations, recommend to you the type and character of equipment and of construction required, and prepare plans and specifications for equipment, material and construction work. As constructors, we will execute with our own forces the construction and install the machinery and equipment, subletting parts of the work when it is to your advantage to do so, and turn the completed work over to you ready for regular use. As purchasing agents, we will purchase the necessary machinery, equipment and materials.

"We will furnish at our own expense: (*a*) The service of the executive officers of the company who will direct and oversee the work performed under this agreement. (*b*) The service of the construction department in our home office. (*c*) The service of the purchasing department in our home office which will assist in the purchase of the machinery, apparatus and materials. (*d*) The service of the accounting and auditing departments in our home office. (*e*) All other expenses of our home office, excepting only the salaries of employees, and materials utilized, in the engineering and drafting departments for your work.

"II. *Compensation.* You are to pay us for the services specified the sum of $55,000, which covers the work included in our estimate of $739,000, dated March 14, 1928. In case the actual cost of the work included in the estimate is less than the estimated cost, our compensation is to be reduced to 7-1/2 per cent. of the actual cost of the completed work. Compensation is payable in installments on the last of each month in the same proportionate amount that the actual expenditure made during that month bears to the total estimated cost of the work, until 90 per cent. of the total is paid, the balance of 10 per cent. being payable on completion of the

work. If material change in the scope of the work is ordered by you there shall be added to or subtracted from this amount a sum equal to 7-1/2 per cent. of the estimated cost of the work added to or deducted from that now contemplated.

"III. *Cost of the work.* It is understood that 'cost of the work' shall include the following items whether commitments or expenditures are made by you direct or by us for your account: (*a*) The cost of all materials, machinery, equipment and labor. (*b*) The cost of tools and construction equipment purchased and the rental of any equipment hired, removing at mutually agreed depreciation such major construction equipment as you do not wish to retain—or we will supply any part of such equipment on a rental basis. (*c*) The cost, at salary rates, of men in the engineering and drafting departments in our home office or in the field, in connection with the engineering or designing, the choice and purchase of materials and apparatus, and the inspection of the work. (*d*) The cost of a works office, including the salaries and expenses of a superintendent of construction, an accountant, a purchasing agent, and such assistants as they may require; the cost of all field engineering and inspection; the expense of maintaining the works office. (*e*) The cost of insurance and any expense incurred in connection with any accident or damage to person or property. (*f*) Any traveling expenses or expenses of a similar character and any other expenditures we may make except for items specified in section 1, as furnished at our own expense.

"IV. *Disbursements.* [1] We will make all payments for material, labor, equipment, services, etc., for your account from funds to be advanced to us by you for the purpose, giving you each month a detailed statement of expenditures during the previous month, supported by proper vouchers. [2] Or should we so elect, we will make such payments from our own funds, giving you periodical statements of disbursements, the amounts of such statements to be paid to us within ten (10) days from date.

"V. *Purchases and contracts.* [a] You will have as full control as you care to exercise of the purchase of materials and equipment and of the letting of such sub-contracts as may seem desirable. [b] All contracts and orders placed by us, payrolls and other obligations, shall be in our name, 'United Engineers & Constructors, Inc.' and it is understood that we assume all pecuniary liabil-

ity under or by reason of such obligations. If funds are advanced by you, in accordance with the first section of Art. IV, we will give you a surety bond, or an escrow agreement covering the deposit of marketable securities, to guarantee that such funds advanced will be used for the purpose expressed in our requests for these advances.

"VI. *Insurance.* Unless otherwise directed by you, we will place insurance covering liability to the public and to employees engaged on this work, with limits of $10,000 for any one person and $20,000 for any one accident, unless workmen's compensation laws make it advisable to secure insurance in some other form or amount. The policies will be in the usual form. If you so request, we will place insurance covering damage to the work, or any part of it, by fire.

"VII. *Progress reports.* We will render reports to you monthly showing the progress of the work in its various parts and any changes that it may seem advisable to make in the estimates of cost or of time required for completion.

"VIII. *Audit.* Our correspondence, records, vouchers, and books of account, in so far as work done or money expended under this agreement are concerned, will be open to your inspection.

"IX. *Acceplance and approval.* On acceptance of this proposition by you and its approval by the president or a vice-president of this company, it will constitute an agreement between us.

"X. *Terminalion of employment.* If at any time you should become dissatisfied with the manner in which the work is being conducted, or should wish for any reason to discontinue the work, you are at liberty after ten days' notice in writing, to terminate our employment and to take possession of the work done and material purchased for you under the terms hereof. In case you take such action, we shall be entitled to receive in payment for our services all installments due us under the terms of section II, including that for the month during which such termination occurs." This agreement was duly executed by the proper officers of the contracting parties.

Upon a consideration of the contract as a whole, we are constrained to hold that it did not create the relation of owner and independent contractor, but established the relation of principal and agent between the parties. The principal test to be applied in determining this question is whether the owner retains the right

to direct or control the time and manner of executing the work, as distinguished from the right to demand a certain result according to the contract. Civil Code (1910), § 4415; *Savannah & Western R. Co.* v. *Phillips,* 90 *Ga.* 829 (3) (17 S. E. 82); *Atlanta & Florida R. Co.* v. *Kimberly,* 87 *Ga.* 161 (3) (13 S. E. 277, 27 Am. St. R. 231); *Quinan* v. *Standard Fuel Supply Co.,* 25 *Ga. App.* 47 (102 S. E. 543); *Davis* v. *Starrett Brothers Inc.,* 39 *Ga. App.* 422 (2) (147 S. E. 530); *Mount* v. *Southern Ry. Co.,* 42 *Ga. App.* 546 (156 S. E. 701), and cit. In the contract under consideration not even a price was fixed for the cost of the construction, but the agreement was based upon a mere estimate of the cost, with a "sliding" or proportionate scale of commissions. It is unnecessary to enumerate the several provisions whereby absolute authority of controlling substantially every detail of the work was reserved in the owner. The various stipulations will speak for themselves, and it is difficult to conceive a contract containing provisions more ample for this purpose. Counsel for the defendant in error say that the contract was made upon a printed form used by engineers and contractors, and that the form as originally printed was clearly an agency contract, but that because of certain erasures and typewritten substitutions, it was evidently the intention of the parties to change the contract from one of principal and agent to that of owner and independent contractor. While we do not entertain the slightest doubt of the correctness of this statement as a matter of fact, the record is silent as to this circumstance. But even to treat the case as involving a contract partly printed and partly written, and to apply the rule that "the latter part is entitled to most consideration" (Civil Code of 1910, § 4268, par. 6), we arrive at the same construction of the agreement under consideration.

Perhaps the most important of the substitutions is that contained in paragraph [b] of section v, providing that all contracts and orders, payrolls and other obligations, should be in the name of the engineer's company, and that this company "would assume all pecuniary liability under or by reason of such obligations." To construe this and other typewritten insertions as establishing the relation of contractor would practically annul many other material provisions of the contract, and these should not be laid aside as meaningless unless those substituted may not reasonably be recon-

ciled therewith. The prime rule of construction is to ascertain the intention of the parties. Civil Code (1910), § 4266. A corollary to this rule is that the construction which will uphold a contract in whole and in every part is to be preferred, and that the whole contract should be looked to in arriving at the construction of any part. Civil Code (1910), § 4268 (3). Thus, the printed portions of a contract will not be absolutely supplanted by the written portions, unless there is such repugnancy between them that they can not be reconciled. *Shackelford* v. *Fitzgerald,* 151 *Ga.* 35, 39 (105 S. E. 597); *Capital Wall Paper Co.* v. *Callan Court Co.,* 38 *Ga. App.* 428 (144 S. E. 135). Here the typewritten parts of the agreement are not necessarily inconsistent with the printed forms. The owner, without destroying the relation of principal and agent, could have required that the other contracting party should assume, as between themselves, absolute liability to every other person who might be dealt with in the erection of the building. In the absence of such a provision, if funds had been entrusted to the agent for the purpose of satisfying demands against the owner and had been lost without negligence on the part of the agent, the loss would have fallen upon the owner, and it was permissible to make of the agent an insurer in this regard. *Benton* v. *Roberts,* 35 *Ga. App.* 749 (5) (134 S. E. 846).

The statement that the engineers company *assumed* liability did not necessarily exclude the idea of *original* or primary liability on the part of the owner (City of Tiffin *v.* Griffith, 74 Ohio St. 219, 77 N. E. 1075; *Simmons* v. *Martin,* 54 *Ga.* 47; 2 C. J. 723; 1 Mechem on Agency, 939); nor could it be said that the owner was not a party to the contract with the Seeley company, merely because this agreement was not executed in its name. The contract for the heating system was not under seal, and could have been executed in behalf of the owner as undisclosed principal. Civil Code (1910), § 3596; *Burkhalter* v. *Perry,* 127 *Ga.* 438, 442 (56 S. E. 631, 119 Am. St. R. 343); *Beacham* v. *Coe-Mortimer Co.,* 30 *Ga. App.* 456 (3) (118 S. E. 441); *Davis* v. *Menefee,* 34 *Ga. App.* 813 (131 S. E. 527); *Schneider Marble Co.* v. *Knight,* 37 *Ga. App.* 646 (2) (141 S. E. 420).

It follows that the engineers company was not a necessary party to the foreclosure proceeding. If this company had been the contractor, judgment against it for the price of the materials would

452

have been essential to a valid judgment of foreclosure; but if we are correct in our conclusion that the Seeley company and not the engineers company was the contractor, this will dispose of the contention of the railway company as to parties.

*Judgment reversed. Jenkins, P. J., and Stephens, J., concur.*