22144. NICHOLS *v.* LINDSEY *et al.*

DECIDED SEPTEMBER 1, 1932. REHEARING DENIED OCTOBER 1, 1932.

*Porter & Mebane,* for plaintiff in error.
*Wright & Covington,* contra.

LUKE, J. J. M. Lindsey and Keiffer Lindsey brought an action against Miss Essie Nichols on a certain contract. The defendant demurred to the petition generally and specially. It was amended, and the court overruled the demurrer. The trial of the case resulted in a verdict for the plaintiffs in the principal sum of $429.09 and $56.28 interest—a total of $485.37. The case came to this court on exceptions to the overruling of the demurrer, and to the overruling of the defendant's motion for a new trial. Omitting the formal allegations, the petition substantially alleges:

2. "That . . during the year 1929, C. H. Nichols . . was the duly authorized agent of . . Miss Essie Nichols with respect to the transaction of all business hereinafter referred to, and particularly was the agent of the said Miss Essie Nichols for the purpose of engaging in the business of buying and selling cottonseed in the City of Rome."

3. "On September 16, 1929, . . petitioners, through said C. H. Nichols as agent, . . entered into a certain contract with the said Miss Essie Nichols under which petitioners furnished certain money to the said Miss Essie Nichols to be used by her agent, C. H. Nichols, in the purchase of cottonseed, which were to be stored by the said Miss Essie Nichols, through her agent, C. H. Nichols, and were to be sold, and the money advanced by your petitioners repaid to your petitioners, and the profits from said sale divided equally between petitioners and the said Miss Essie Nichols. . ."

4. "In pursuance of said contract . . petitioners furnished to the said Miss Essie Nichols . . $1,000, or more, and . . said C. H. Nichols, as agent of the said Miss Essie Nichols, purchased cottonseed with this fund, but he illegally diverted the proceeds thereof, and sold said cottonseed and appropriated the same to the use of the said Miss Essie Nichols; and though the sums sold by him were largely in excess of the amount advanced by your petitioners, there still remains due to your petitioners, and unpaid to your petitioners, from the sale of said cottonseed . . the sum of $674.51."

5. "Said illegal sale of said cottonseed by the said Miss Essie Nichols, through her aforesaid agent, occurred on or about January 1, 1930; and by reason of said facts . . petitioners are entitled to . . recover of the said Miss Essie Nichols . . $674.51 as principal, . . with interest thereon . . from Jan. 1, 1930."

Petitioners prayed that Miss Essie Nichols be required to account for all sums received by her, or her agent, C. H. Nichols, from the sale of cottonseed purchased with money advanced by the petitioners under said contract, and that they have judgment against Miss Essie Nichols.

The copy of the contract declared upon attached to the petition is headed, "Seed-Purchase Contract," dated September 16, 1929, and recites that the contract is between "C. H. Nichols, agent, party of the first part, and J. M. Lindsey and Keiffer Lindsey, parties of the second part;" that "C. H. Nichols, agent, . . in consideration of the purchase-price to be furnished by parties of the second part, agrees to buy and store cottonseed in his warehouse (2 warehouses) at his gin at Pinson, Ga.;" that "it is estimated that approximately 50 tons of seed can be stored and held for an agreed price for sale;" that "money for the purchase-price of seed is to

be deposited in the National City Bank of Rome" on a special checking account; that sales were to be made by mutual agreement; that "the purchase-price contemplated . . is the price to ginners paid by Rome Cotton Oil Company from day to day as purchases are made;" that the cost of stirring said seed and the cost of fire insurance be charged to profit and loss; and that the profits from the sale of said seed be divided "fifty fifty" between "C. H. Nichols, agent," and "J. M. and Keiffer Lindsey." The contract was signed: "C. H. Nichols, Agent, J. M. Lindsey, Keiffer Lindsey."

The petition was amended as follows:

1. "That petitioner advanced to the said defendant herein the following sums on the following dates for the purposes stated in said original petition, to wit: Sept. 18, 1929, $980; Nov. 2, 1929, $490; total, $1470.

2. "Petitioner further shows . . that he has been repaid by defendant herein from the sale of cottonseed, in accordance with the contract set forth in the original petition, . . the following sums, to wit: ———— $156.91; May 22, 1930, $434.00; total, $590.91."

In her general demurrer to the petition, Miss Essie Nichols contends: 1. That the allegations of paragraphs 2 and 3 of the petition "seek to add to, vary, and take from the terms of a written contract, . . said paragraphs showing that said writing is a contract between C. H. Nichols and J. M. Lindsey and Keiffer Lindsey, as a matter of law." 2. "That said written instrument shows that said contract was one between C. H. Nichols, party of the first part, and J. M. Lindsey and Keiffer Lindsey, as parties of the second part, as a matter of law, and not a contract between plaintiffs and defendant herein."

Unquestionably, the word "agent," so frequently appearing in the contract under consideration, is prima facie merely descriptio personæ, and prima facie the contract is between C. H. Nichols, as an individual, and J. M. and Keiffer Lindsey. However, this fact does not inhibit the Lindseys from averring by appropriate pleading that Miss Essie Nichols was the undisclosed principal of C. H. Nichols, and was liable on said contract. In *Burkhalter* v. *Perry*, 127 *Ga*. 438, 441 (56 S. E. 631, 119 Am. St. R. 343), where the paper involved was a promissory note not under seal, Justice Evans, speaking for the court, said: "The general rule of law is that if

an agent sign a note with his own name alone, and there is nothing on the face of the note to show that he is acting as agent, he will be personally liable on the note, and the principal will not be liable. If an agent make a note in his own name, and add to his signature the word 'agent,' and there is nothing in the note to indicate who is the principal, the agent will be personally liable, just as if the word 'agent' was not added. *Graham* v. *Campbell,* 56 *Ga.* 262. If the suit had been against D. C. N. Burkhalter, he would not have been permitted to shift his responsibility by showing that the note was not in fact his individual obligation, but that of his principal. The addition of the word 'agent' was simply descriptio personæ, and the note would be his individual obligation. Another and entirely different question is presented when the suit is against the principal and the declaration contains appropriate allegations that the note sued on was the note of the principal, signed by his duly constituted agent, with intent thereby to charge the principal. . . The rule seems to be general, that under appropriate pleading, where a contract in writing not under seal and other than a negotiable instrument is made in another name than that of the real principal, the real principal can sue and be sued. Beckham *v.* Drake, 11 Mees. & Wel. 315. It may possibly require some subtlety and refinement of reasoning to take this principle out of the operation of the rule that a written instrument can not be added to, varied, or explained by parol. However, the distinction is firmly established in our jurisprudence, and is in the interest of fair dealing, that the real party to the contract, though his name may not appear therein, in the adjustment of disputes arising out of that contract between the contracting parties, should be allowed both to sue and be sued. Metcalf *v.* Williams, 104 U. S. 93, 96 [26 L. ed. 665]. This is especially true where the word 'agent,' 'trustee,' or 'general manager,' appears after the signature of a party to the contract. 'A contract signed by a person who adds after his signature the words "general manager" is not the individual undertaking of the person signing, if, . . in a suit for its breach, this fact appears by extrinsic evidence.' *Raleigh R. Co.* v. *Pullman Co.,* 122 *Ga.* 700" (50 S. E. 1008). See also *Buffalo Forge Co.* v. *So. Ry. Co.,* 43 *Ga. App.* 445, 451 (159 S. E. 301), and cit. We are satisfied that, under the foregoing authorities, the general demurrer to the petition was properly overruled.

The special grounds of the demurrer are directed at paragraphs 4 and 5 of the petition. For convenience, we shall briefly set out the substance of these grounds by paragraphs. The defendant demurs to paragraph 4 of the petition upon the following grounds: 4. The sums aggregating the $1,000 referred to in said paragraph of the petition are not set out, and the dates when such sums were furnished are not shown. 5. It "is not definitely alleged whether the said C. H. Nichols, the alleged agent of the defendant, converted large sums of money . . to his own use, or whether or not the said C. H. Nichols . . converted the proceeds from the sale of cottonseed to his own use." 6. It "is not alleged from whom the said C. H. Nichols . . purchased cottonseed, . . nor the amount of cottonseed that he purchased, nor the amount that he paid therefor." 7. It "is not alleged to whom the said C. H. Nichols . . sold said cottonseed, nor the amount that he sold, nor when sold." 8. It "is not alleged what amounts the said C. H. Nichols . . appropriated to his own use, nor from whom he received the amounts which he appropriated, nor the dates on which he appropriated said sums to his own use." 9. It is "not specifically alleged in what way or in what manner defendant is indebted to the plaintiffs in the sum of $674.51. . ." 10. It "is not alleged how or in what manner and for what reason the defendant remains due the plaintiffs . . the sum of $674.51."

The defendant demurs to paragraph 5 of the petition, upon the following two grounds: 11. It "is not alleged to whom defendant, through her said agent, C. H. Nichols, sold cottonseed, nor the amount that was sold, nor the market price of said cottonseed. . ." 12. It "is not alleged how nor in what way or manner defendant is indebted to the plaintiffs in the sum of $674.51. . ."

This court has said: "Reasonable definiteness and certainty in pleading is all that should be required; and factitious demands by special demurrer should not be encouraged." *Busby* v. *Marshall*, 3 *Ga. App.* 764 (60 S. E. 376); *Webb Cotton Co.* v. *Gordon*, 19 *Ga. App.* 63 (90 S. E. 1032). In *Charleston & Western Carolina Ry. Co.* v. *Attaway*, 7 *Ga. App.* 231 (2) (66 S. E. 548), this court said: "Reasonable certainty is all that can be required, even as against special demurrer."

Considering the nature of this action, and the fact that some of the very specific information invoked by the demurrer must have

been peculiarly within the knowledge of the alleged agent of the defendant, we are satisfied that the court did not err in overruling the special demurrer.

The answer in this case is merely a denial of the allegations of the petition. J. A. Palmer, assistant cashier of the National City Bank of Rome, testified, in substance, that the ledger sheet handed him, and headed "Lindsey Cotton Seed Account," was the original ledger sheet showing the deposits on that account; that said account was opened on September 18, 1929, with a deposit of $980.47; that on November 2 there was a deposit of $91.47 brought forward from a previous deposit, and another deposit of $490; that the checks covering said amounts were not in the bank's possession; that witness thought said checks were signed "Lindsey Seed Account, by C. H. Nichols," but that he would not swear that they were; that the ledger sheets exhibited to him of the account of "C. H. Nichols, Agent," covering a period of time from 1928, to December 6, 1929, were original ledger sheets of said bank; that none of the checks on said account were in the possession of the bank; that he did not think that C. H. Nichols carried an account with said bank in his own name "during that time;" that about the time a garnishment was served on the "C. H. Nichols, Agent," account, probably in November 1929, "a little account was opened by Miss Essie Nichols;" that the sheets exhibited to witness "apparently began in November, 1930, and ran through the first in the name of Miss Essie Nichols;" that it was witness' recollection that "there were additional sheets in the name of Miss E. M. Nichols, beginning about the time this account was closed, and running up to the present time;" that the main account of Miss Essie Nichols, or Miss E. M. Nichols, was the 1930 account; that witness did not know of any other account "run by her;" and that he wouldn't say that Miss Essie Nichols had anything to do with the "C. H. Nichols, Agent," account.

Recalled for further examination, J. A. Palmer testified that certain ledger sheets he had in hand were the original ledger sheets of the E. M. Nichols account; that the "signature card" for that account was written, "Miss E. M. Nichols, by C. H. Nichols;" and that "we had instructions to honor checks on that account signed in that way, from C. H. Nichols." On re-cross-examination this witness swore that he "did not think Miss Nichols had anything

to do with that account;" that he did not know what the checks on the Lindsey Seed Account were given for, or by whom they were drawn; that the same was true of the "C. H. Nichols, Agent," account; and that witness could not say whether or not the deposit of $980 on the Lindsey seed account was the proceeds of a note. (The accounts identified by the witness Palmer were introduced in evidence.)

C. W. Martin testified that he operated a gin for C. H. Nichols at Pinson Station, ten miles from Rome, until November 20, 1929. He further swore: "During that time I bought . . cottonseed from three different accounts. . . The first I bought was "C. H. Nichols, straight, for something like fifteen days. . . Sometimes I bought seed on the 'Mr. Lindsey Seed Account,' and those checks were printed on the Lindsey Seed Account, and I was authorized to sign them, 'C. H. Nichols, Agent, by C. W. Martin.' Mr. Nichols authorized me to sign those checks. . . I don't know who drew the remainder of the checks against that account after I left there in November. I bought the cottonseed from the patrons of the gin. Some of these seed were hauled by truck, and some were put in a car and shipped. I can't tell you where they were shipped. Mr. Nichols did the billing, . . but the ones that were hauled away were delivered to the Rome Oil Mill. I don't know who claimed to own the gin. . . She [Miss Essie Nichols] did not have anything to do with the operation of the gin. . . There was no separation made of the seed. . . He had two warehouses there, and he would just fill one warehouse, and then change the chute and fill the other. . . There was no effort to segregate the seed so that the money could be apportioned."

Keiffer Lindsey testified that the original contract had been lost, but that it was duly executed and was identical with the copy contract attached to the petition; that pursuant to said contract he deposited $980 in the National City Bank on September 18, 1929, and $490 on November 2; that the payments received from Mr. Nichols on said account were $434 on May 22, 1930, and $156.91; that witness also received some notes, the amounts of which he did not know; that witness never had anything to do with the disbursement of the money, except that he checked out said balance of $156.91 found in the bank at the end of the year; that the copy of the account attached to the petition was correct; and that he did

not know what Nichols did with the money, and did not know that he misappropriated it.

J. C. Tedford testified that he was cashier of the Rome Oil Mill and kept the records of that concern; that in the fall of 1929 and early in 1930 said mill bought cottonseed from C. H. Nichols, and witness had a statement of Nichols' account; that from January, 1929, to June, 1929, the account was handled in the name of C. H. Nichols; that from July, 1929, to May, 1930, the account was in the name of "C. H. Nichols, Agent for Miss Essie Nichols;" that witness did not know why the name of the account was changed; that a statement of said account was rendered each week to C. H. Nichols; that the statement witness had correctly showed all cottonseed delivered by Nichols and "paid for to him;" that witness could not say where the cottonseed bought from Nichols came from; that witness's transaction with Miss Essie Nichols concerned the fourth ward gin; that seed shipped from Shannon to his company were shipped in the name of H. S. Nichols and C. H. Nichols, and "the account read that way;" that witness never heard of Miss Nichols having anything to do with that account; that the $800 "due C. H. and H. S. Nichols was transferred . . as a credit to the C. H. Nichols account;" that the C. H. Nichols account was not wiped out, but was transferred and carried on. On cross-examination this witness swore: "Miss Nichols . . did not have anything to do with transferring that account—not that I know of. In some way $800 was transferred and charged up to this defendant without any knowledge on her part that I know of." Copies of the accounts identified by the witness Tedford were introduced in evidence.

We copy from the record as follows:

"Mr. Wright: We tender now from the plaintiff's evidence in a case to which I have heretofore referred the following portion of the testimony of Miss Essie Nichols: 'I do not know that he mingled money from the gin with my money. I just left everything with him, and he handled the entire business. The only thing I knew about it was that when I wanted money he gave it to me. We were supposed to split the profits. I don't know whether any profits were ever made. Everything was in the hands of my father, and he had authority to do what he thought was necessary for the business.'"

Recalled by the plaintiffs, Keiffer Lindsey adhered substantially

to his contention that the amendment to the petition was correct.

Miss Essie Nichols testified that C. H. Nichols was her father; that the first she knew of the contract declared upon was when she was served with suit; that she had nothing whatever to do with the Pinson gin; that said gin belonged to her brother and he and her father were supposed to operate it; that witness owned only one gin—the fourth ward gin; that her father had been connected with witness in operating said gin since 1926; that C. H. Nichols was never connected with any other gin in her behalf at any time; that witness had never authorized anybody else to check on her account "in connection with the Pinson gin, or any seed account;" that the seed from witness's gin were sold to the Rome Oil Mill, but some of them may have been sold to other mills; that her father looked after the selling of seed from her gin for her; and that C. H. Nichols did not run the fourth ward gin altogether— that witness "had the signing of all notes and . . any important contracts." This witness further swore: "My father . . had authority to handle my bank account in connection with the gin. I think he tried to handle my bank account in the name of 'C. H. Nichols, Agent,' and he found he could not; . . some garnishments were run on it and caught some money. The account of C. H. Nichols, Agent, was my account. He was running it as agent for me—the one on the National City Bank. . . I understand that there had been a Miss Nichols account at the bank since June, 1927. That was my account. After that my father was authorized to handle money belonging to me through that account. . . He did not have the right to handle anything else through that account except the fourth ward gin business. The money that he received from the fourth ward gin went into that account. I have drawn checks on that account . . for my personal expenses, . . and not in connection with the business." This witness further testified that her father continued to run the fourth ward gin business until 1929, when witness took charge of the business and operated it; that witness could not say what was the source of the deposit to the Miss E. M. Nichols account on Nov. 12, 1929— that the money the Rome Oil Mill paid her father on that date "was borrowed money on our seed;" that she did not know the source of another deposit of $200 on November 20, 1929; and that the Pinson gin was operated by an engine for which she "signed the

contract," but that she "objected to placing it up there strenuously."

The seed contract, the "C. H. Nichols, Agent-Rome Oil Mill" account, and the "C. H. Nichols-National City Bank" account were introduced in evidence.

The foregoing is a fair resume of the evidence in this case, with the exception that we have not attempted to set out the various accounts introduced in evidence. We have given the record more than ordinary study, and are not satisfied that we would have reached the same conclusion as did the jury trying the case. However, proof of agency may be shown by implication (Civil Code (1910), § 3569)—that is to say, by "showing circumstances, apparent relations, and the conduct of the parties." See *Martin* v. *Bridges & Jelks Co., 18 Ga. App.* 24 (2) (88 S. E. 747). This is the manner in which it is sought to show agency in the case at bar, and the jury concluded that it was shown, and that the case was made out. We do not feel authorized to reverse the finding of the jury, and we hold that the trial judge did not err in overruling the general grounds of the motion for a new trial.

The motion for a new trial contains seven special grounds. The first five of these deal with alleged errors in admitting evidence, and the last two with alleged erroneous instructions of the court. None of these grounds presents a new question and none discloses reversible error.

*Judgment affirmed.* *Broyles, C. J., and Hooper, J., concur.*